Slip Op. 11-159

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                               :
MUELLER COMERCIAL DE MEXICO,    :
S. DE R.L. DE C.V.,             :
                               : Before:  Richard K. Eaton, Judge
      and                       :
                               : Court No. 10-00163
SOUTHLAND PIPE NIPPLES CO.,     :
INC.,                           :
                               :
      Plaintiffs,               :
                               :
      v.                        :
                               :
UNITED STATES,                  :
                               :
      Defendant,                :
                               :
      and                       :
                               :
UNITED STATES STEEL             :
CORPORATION,                    :
INC.                            :
                               :
      Defendant-Intervenor.     :
_____:
```

OPINION AND ORDER

[Plaintiffs' motion for judgment on the agency record is granted, and the matter is remanded to the Department of Commerce.]

Dated: December 16, 2011

*White & Case LLP* (*David E. Bond, Yohai Baisburd, and Jay C. Campbell*), for plaintiffs Mueller Comercial de Mexico, S. de R.L. de C.V. and Southland Pipe Nipples Co., Inc.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Douglas Edelschick*); Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*Ahran Kang McCloskey*), of counsel, for defendant.

*Skadden, Arps, Slate, Meagher & Flom LLP* (*Robert E. Lighthizer* and *Jeffrey D. Gerrish*), for defendant-intervenor United States Steel Corporation.

Eaton, Judge:  Before the court is plaintiffs' motion for judgment on the agency record, pursuant to USCIT R. 56.2, challenging the Department of Commerce's ("Commerce" or the "Department") final results of the Sixth Administrative Review of the antidumping duty order on *Certain Circular Welded Non-Alloy Steel Pipe (*"CWP*") from Brazil, the Republic of Korea, Mexico, and Venezuela*, 57 Fed. Reg. 49,453 (Dep't of Commerce Nov. 2, 1992) (final determination and amendment to final determination of sales at less than fair value) (the "Order") for the period of review ("POR") August 1, 2007 through July 31, 2008.  *See CWP from Mexico*, 75 Fed. Reg. 20,342 (Dep't of Commerce Apr. 19, 2010) (final results) and the accompanying Issues and Decision Memorandum ("Issues & Dec. Mem.") (collectively, the "Final Results").

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2006).  For the reasons set forth herein, the plaintiffs' motion is granted and the matter is remanded to Commerce.


BACKGROUND

Plaintiffs Mueller Comercial de Mexico, S. de R.L. de C.V. ("Mueller") and Southland Pipe Nipples Co., Inc. ("Southland")

(collectively, "plaintiffs") challenge the Department's

determination, in the Final Results, to assign Mueller an antidumping

duty rate of 48.33% based on adverse facts available ("AFA").[1]

Plaintiff Mueller is a Mexican company whose business includes

selling CWP in the United States that it purchases from Mexican

producers.  Mueller's merchandise is imported by its U.S. affiliate,

plaintiff Southland.

On November 3, 2008, Commerce published notice of the

opportunity to request an administrative review of the Order for the

POR November 1, 2007 through October 31, 2008.  Thereafter, both

Mueller and defendant-intervenor United States Steel Corporation

asked Commerce to conduct an administrative review of Mueller's

entries of CWP.  On March 10, 2009, the Department selected Mueller,

Tuberia Nacional, S.A. de C.V. ("TUNA"), and Hylsa, S.A. de C.V.

---

[1]     The Department generally makes its antidumping
determinations based on the information it solicits and receives from
interested parties concerning the normal value and export price of
the subject merchandise.  Commerce may, however, rest its
determinations on "facts otherwise available . . . to fill in the
gaps when Commerce has received less than the full and complete facts
needed to make a determination."  *Gerber Food (Yunnan) Co., Ltd. v.
United States*, 29 CIT 753, 767, 387 F. Supp. 2d 1270, 1283 (2005)
(quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381
(Fed. Cir. 2003)).  Having determined that the use of facts otherwise
available is warranted, if the Department further finds that "an
interested party has failed to cooperate by not acting to the best
of its ability to comply with a request for information . . .
[Commerce] may use an inference that is adverse to the interests of
that party in selecting from among the facts otherwise available."
19 U.S.C. § 1677e(b).

("Hylsa") as mandatory respondents in the administrative review.

*See* Mem. re Selection of Respondents, A-201-805 (Dep't of Commerce

Mar. 10, 2009) at 7 (P.R. Doc. 24).  Mueller had not been a respondent

in any of the five previous reviews of the Order.

Plaintiffs claim that both prior to and during the POR, Mueller

purchased the CWP it exported to the United States from the two

Mexican producers that were mandatory respondents in the review–TUNA

and Hylsa.  According to plaintiffs, relying on Commerce's reseller

policy[2] in the period before and during the POR, Southland posted cash

deposits on the entries Mueller purchased from TUNA and Hylsa at those

producers' respective antidumping duty deposit rates of 2.92% and

10.38%.  *See* Mem. to File re CWP from Mexico: Customs Package

Information of 2007-2008 Period of Review, A-201-805 (Dep't of

Commerce June 9, 2009) (C.R. Doc. 9) ("Customs Data File").

On May 29, 2009, after responding only to Section A of Commerce's

Antidumping Duty Questionnaire, Mueller informed Commerce that it

would not participate in the administrative review.  *See* Letter from

White & Case LLP to Secretary of Commerce (May 29, 2009) (P.R. Doc.

---

[2]       Pursuant to the reseller policy, under certain
circumstances, an exporter that does not produce the goods it exports
pays the cash deposit rate of its producer. *See Parkdale Int'l, Ltd.
v. United States*, 31 CIT 1229, 1231, 508 F. Supp. 2d 1338, 1343 (2007)
("Because the producer is assumed to be the first company in the
commercial chain that knew of the product's destination, cash
deposits for antidumping duties on all merchandise sold to identified
resellers is initially set at the producer's cash deposit rate.").

53).  According to Mueller, it decided not to participate because the review had been rescinded with respect to TUNA,[3] and it became apparent that Hylsa was not going to participate.  Mueller maintains that it would have been futile for it to continue further with the review because the information necessary to determine its antidumping duty rate would have had to come from its producers, TUNA and Hylsa. Pls.' Mem. Pts. Auth. Supp. Mot. J. Agency R. ("Pls.' Mem.") 4.

Based on Mueller's withdrawal from participation in the review, Commerce applied AFA to determine Mueller's antidumping duty rate. *See* Issues & Dec. Mem. at 10 ("Because Mueller did not cooperate in this review by refusing to respond to the Department's questionnaire, we have applied total AFA for these final results."); *see also Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1321 (Fed. Cir. 2010) (quoting 19 U.S.C. § 1677e(b)) ("Upon a finding that an interested party refuses to cooperate with [Commerce's] information requests, Commerce 'may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.'").  The Department assigned Mueller the AFA rate of 48.33% based on a single transaction of TUNA's during the Fifth

---

[3]     The Department rescinded the review with respect to TUNA because the company timely notified Commerce, in accordance with 19 C.F.R. § 351.213(d)(3) (2011), that it did not have any exports of subject merchandise to the U.S. during the POR. Issues & Dec. Mem. at 15.

Administrative Review of the Order, which covered the period 1998

through 1999.  *See* Issues & Dec. Mem. at 10*; see also Memorandum re*

*CWP from Mexico, Use of Adverse Facts Available (AFA) and*

*Corroboration of AFA Rate,* A-201-805 (Dep't of Commerce Nov. 30,

2009) (the "AFA Memo").


## STANDARD OF REVIEW

The standard of review is set forth in 19 U.S.C. §

1516a(b)(1)(B)(i), which provides, in relevant part, that the court

"shall hold unlawful any determination, finding, or conclusion found

. . . to be unsupported by substantial evidence on the record or

otherwise not in accordance with law."


## DISCUSSION

I.  Commerce's Final Results

In the Final Results, Commerce assigned Mueller the AFA rate

of 48.33%,[4] which was greater than the highest overall rate

determined in either the original investigation or any subsequent

review.  In assigning that rate, the Department did not follow its

established practice of applying the highest overall margin

determined in any segment of the proceeding - in this case, the

---

[4]     In arriving at this rate, Commerce chose the highest
transaction-specific margin calculated for TUNA in the Fifth
Administrative Review.  Issues & Dec. Mem. at 10.

all-others rate of 32.62% - to an uncooperative respondent.  *See* AFA

Memo at 7 ("Generally, the Department finds that selecting the

highest rate from any segment of the proceeding as AFA is

appropriate.").

Commerce reasoned that it should assign a rate even higher than

the all-others rate because "as Mueller has never previously been

reviewed by the Department, it is currently subject to the 32.62

percent rate."  AFA Memo at 9; *see also* Issues & Dec. Mem. at 11. Based

on this finding, Commerce further concluded that by withdrawing from

the review, Mueller demonstrated that "the all-others rate [of

32.62%] proved insufficiently adverse to induce Mueller to cooperate

to the best of its ability in this administrative review."  AFA Memo

at 9.  Accordingly, Commerce "deem[ed] it necessary to apply a rate

higher than the all-others rate to which Mueller is already subject.

Otherwise, Mueller would have no incentive to cooperate."  AFA Memo

at 9.  The Department ultimately found "48.33 percent to be

sufficiently high so as to encourage Mueller's participation in future

segments of this proceeding."  AFA Memo at 9.  According to

Commerce,

> applying 48.33 percent to . . . Mueller would ensure [that
> the company] shall not benefit from [its] failure to
> cooperate in this administrative review and provides an
> incentive for . . . Mueller to cooperate in future segments
> of the proceeding.

AFA Memo at 8.  In other words, Commerce determined that, because

Mueller was subject to the 32.62% rate prior to the POR and nevertheless withdrew from the review, a higher rate was needed to insure that it did not profit from its decision not to participate in the review and to encourage compliance in future reviews.

In addition, the Department determined that it could not take into account Mueller's claim that it complied with Commerce's reseller policy by making cash deposits for its entries equal to the antidumping duty rates assigned to its alleged producers - TUNA and Hylsa.  Commerce found that "[w]hile we recognize Mueller's claim that its entries of subject merchandise sourced from TUNA and [Hylsa] would be subject to those producers' individual cash deposit rates, because of Mueller's failure to cooperate, we cannot determine the universe of Mueller's sales, let alone the origin of those unreported sales."  Issues & Dec. Mem. at 11.  Put another way, the Department found that Mueller's failure to participate in the review prevented Commerce from determining if its entries were subject to the rate set under the reseller policy.  Thus, according to Commerce, it would be "inappropriate" to determine if the reseller policy would apply to Mueller's entries.  *See* Issues & Dec. Mem. at 11.


II.  Plaintiffs Insist Mueller Should Be Assigned the All-Others
     Rate
        Plaintiffs' threshold argument is that the Department's

determination is unlawful because Commerce lacked any reasonable
basis for departing from its established practice of assigning an
uncooperative respondent[5] the highest overall rate from any segment
of the proceeding as the AFA rate.  Here, the all-others rate of
32.62%.  Plaintiffs assert that the Department's determination to
depart from its established practice was contrary to law because "it
is only in extraordinary circumstances - none of which are present
here - that [the Department] deviates from using the highest rate
assigned in a previous segment of the proceeding."  Pls.' Mem. 15.
Plaintiffs maintain that such "extraordinary circumstances" exist
when the highest overall margin is equal to the cash deposit rates
of a respondent subject to AFA, such that the "adverse consequences
for the respondent would have been diminished . . . because [the
respondent] would not have owed monies over and above the deposited
amounts."  Pls.' Mem. 16.

    According to plaintiffs, such extraordinary circumstances are
not present here because Mueller's cash deposit rates were well below
the 32.62% all-others rate.  Specifically, they claim that Mueller's
cash deposit rates were 2.92% for merchandise manufactured by TUNA,
and 10.38% for merchandise manufactured by Hylsa.  Thus, they insist
that "[b]ecause the rates at which Mueller deposited duties were far

---

        [5]    Plaintiffs do not dispute that, by failing to answer the
Department's questionnaires, Mueller was an uncooperative
respondent subject to the application of AFA.

below the 32.62% rate, assigning AFA to Mueller Mexico based on [Commerce's] declared practice would have had significant adverse consequences." Pls.' Mem. 17.  For plaintiffs, "[u]nder these circumstances, there was no legitimate reason or reasonable basis for [Commerce] to depart from its established practice and select an aberrationally high, transaction-specific rate as AFA."  Pls.' Mem. 17.

Moreover, plaintiffs contend that the record does not support Commerce's finding that it could not determine whether Southland posted cash deposits at the rates of TUNA and Hylsa.  While recognizing that Mueller withdrew its questionnaire responses, plaintiffs assert that these responses were unnecessary to a finding relating to the deposits.  Rather, plaintiffs note that the Department itself obtained Customs' documentation for eleven of Mueller's entries during the POR, all of which confirmed that Southland paid cash deposits on those entries at TUNA's and Hylsa's antidumping duty rates.  Pls.' Mem. 17-18; *see also* Customs Data File.  Plaintiffs further insist that, if this documentation was not sufficient to establish the amounts of Southland's cash deposits, Commerce could have further confirmed Southland's cash deposits by obtaining the balance of Mueller's entry documentation from Customs. Pls.' Mem. 18.

III.  Analysis

     A. Legal Framework for the Selection of AFA Rates

     When selecting an appropriate AFA rate, "Commerce must balance

the statutory objectives of finding an accurate dumping margin and

inducing compliance." *Timken Co. v. United States*, 354 F.3d 1334,

1345 (Fed. Cir. 2004).  Under 19 U.S.C. § 1677e(b), the Department

may select "secondary information" as facts otherwise available in

determining AFA rates, which "includes '[i]nformation derived from

the petition that gave rise to the investigation or review, the final

determination concerning the subject merchandise, or any previous

review under [19 U.S.C. § 1675] concerning the subject merchandise.'"

*KYD, Inc. v. United States,* 607 F.3d 760, 765 (Fed. Cir. 2010)

(citations omitted).

     It is undisputed that Commerce's usual practice is to assign

an uncooperative respondent the highest overall rate from any segment

of the proceeding as AFA.[6]  *See* AFA Memo at 7 ("Generally, the

_____

     [6]     Just what constitutes a lack of cooperation to justify the
application of this rule is an open question.  In the seminal case
*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990),
the Federal Circuit first confirmed the "common sense presumption"
that a respondent that fails to answer Commerce's questionnaires does
so "knowing the rule" that it will be assigned the highest rate from
any segment of the proceeding.  This presumption, however, has been
refined over the years.

     In addition, in the most recent cases where the [*Rhone
     Poulenc*] presumption is mentioned, the Federal Circuit
     appears to restrict its use to situations where a

Department finds that selecting the highest rate from any segment of the proceeding as AFA is appropriate.").

This practice was first upheld by the Federal Circuit in *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990). As this Court has recently noted:

> The *Rhone Poulenc* case is most often cited for its statement on the assignment of the highest prior margin to an uncooperative respondent: "[I]t reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced current information showing the margin to be less." *Rhone Poulenc*, 899 F.2d at 1190. In other words, the case stands for the proposition that a respondent can be assumed to make a rational decision to either respond or not respond to Commerce's questionnaires, based on which choice will result in the lower rate.
>
> *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 35 CIT __,

---

> respondent has not answered Commerce's questionnaire at all, rather than when the questionnaire responses were found wanting for one reason or another. In fact, in the most recent case citing the *Rhone Poulenc* presumption, the Federal Circuit paid particular attention to the fact that the exporter put nothing on the record. *See KYD*, 607 F.3d at 764 ("King Pac had elected not to cooperate at all in the review."); *see also id*. at 767 ("King Pac's failure to cooperate deprived Commerce of the most direct evidence of King Pac's actual dumping margin."). Thus, the *KYD* case seems to confirm that "common sense" restricts the *Rhone Poulenc* presumption to cases where a respondent can be assumed to have chosen not to respond to a questionnaire at all, in order to achieve a lower rate.

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 35 CIT __, __, 752 F. Supp. 2d 1336, 1347 (2011). Here, it is apparent that Mueller was an uncooperative respondent because it withdrew all of its answers to Commerce's questionnaires.

__, 752 F. Supp. 2d 1336, 1348 (2011).  Thus, *Rhone Poulenc*

established that Commerce may assign the highest rate from any

segment of the proceeding to an uncooperative respondent based on

that respondent's knowing[7] decision to accept this highest rate as

a result of its considered choice not to answer Commerce's

questionnaires.  This idea that an uncooperative respondent

receives the highest rate by choice, based on an understanding of

its position, is carried forward in recent cases.  *See KYD*, 607 F.3d

at 766-67 (quoting *Rhone Poulenc*, 899 F.2d at 1190).

     As is the case with all established agency practices, if the

Department chooses to depart from this practice it is required to

provide a reasonable explanation for doing so.  *See Allegheny Ludlum*

*Corp. v. United States*, 24 CIT 452, 459, 112 F. Supp. 2d 1141, 1148

(2000) ("'Although Commerce is traditionally granted broad

discretion in its selection of methodology to implement the

---

[7]     What a respondent knows, or should know, is a common aspect
of the unfair trade laws.  *See, e.g., Quingdao Taifa Group Co. v.*
*United States,* 33 CIT __, __, 637 F. Supp. 2d 1231, 1239 (2009) ("A
reasonable and responsible foreign producer would have known that
it must keep and maintain documents such as factory-out slips,
production notices, and production subledgers, and [respondent's]
officials' efforts to avoid producing the requested documents
demonstrates that Taifa failed to put forth maximum efforts to
investigate and obtain the documents.").  Indeed, the reseller
policy itself relies on the notion that the antidumping duty rate
should be that of the "first company in the commercial chain that
knew, at the time merchandise was sold, that the merchandise was
destined for the United States." *Reseller Notice*, 63 Fed. Reg. at
55,362.

[antidumping and countervailing duty statutes], Commerce may not
abuse its discretion and its choice of methodology may not be
arbitrary.'  Rather, 'an agency must either conform itself to its
prior decisions or explain the reasons for its departure.'")
(internal citations omitted).


     B. Commerce's Determination to Depart from Its Established
       Practice was Contrary to Law and Unsupported By Substantial
       Evidence

Here, Commerce has not adequately explained its reasons for
departing from its established practice of assigning the highest
previous rate to an uncooperative respondent as AFA.  This is because
it has failed to support its findings with respect to the antidumping
duty rate to which Mueller's entries were subject prior to the POR.
This failure has two aspects.  First, Commerce has not adequately
explained its basis for determining that Mueller knew or should have
known it was subject to the 32.62% all-others rate prior to the POR.
Second, Commerce's determination that Mueller was subject to the
all-others rate is not supported by substantial evidence because it
ignores record evidence that Mueller's entries were, in fact, subject
to lower rates based on Commerce's reseller policy.  Accordingly,
the court finds that the Department's determination to apply the
48.33% rate must be remanded.

As noted, in accordance with *Rhone Poulenc* and its progeny, a

prerequisite to Commerce's assignment of a rate in excess of 32.62%
is that Mueller knew, or could be presumed to have known, that it
was subject to the all-others rate prior to the POR.  Here, the
Department's reason for departing from its established practice was
that, as a respondent that had not been previously reviewed, Mueller
was subject to the highest prior margin from the investigation
onward.  This being the case, it was apparent to Commerce that a rate
higher than the all-others rate of 32.62% was necessary in order to
keep Mueller from profiting from its decision not to participate in
this review, and to encourage Mueller's compliance in future reviews.
In other words, Commerce assumed that Mueller was subject to the
all-others rate prior to the POR and, based on this assumption,
concluded that, because Mueller withdrew from the review, the
all-others rate was clearly not sufficiently adverse to it to insure
the company's cooperation.

Therefore, Commerce determined not to follow its established
practice by assigning Mueller the highest previous rate from any
segment of the antidumping proceeding, because it found that

> the all-others rate proved insufficiently adverse to
> induce Mueller to cooperate to the best of its ability in
> this administrative review . . . [because] as Mueller has
> never previously been reviewed by the Department, it is
> currently subject to the 32.62 percent rate.  <u>We deem it
> necessary to apply a rate higher than the all-others rate
> to which Mueller is already subject.  Otherwise, Mueller
> would have no incentive to cooperate.</u>

AFA Memo at 9 (emphasis added).

As has been seen, for Commerce's determination to be lawful, Mueller must be found to have made a knowing decision not to respond to Commerce's questionnaire requests. That is, it must have been the case that Mueller was aware, or that Mueller could have reasonably been presumed to be aware, that it was subject to the all-others rate prior to the POR for Commerce to be justified in departing from its established practice. Notably, while the Department assumed that Mueller was subject to the all-others rate, Commerce does not discuss how it was that Mueller knew that it was subject to this rate or how the company could reasonably be charged with such knowledge. Since a knowing decision not to participate in the review is required for the assignment of the highest rate from any segment, the same is also necessary for Commerce to assign an even higher rate pursuant to AFA. The Department's failure to address the question of whether Mueller had, or could be charged with, knowledge that it was at all times subject to the 32.62% rate, thus, requires a remand.

In addition, Commerce's reseller policy suggests that Mueller was not, in fact, subject to the all-others rate prior to the POR. Under the reseller policy, "company-specific [antidumping] assessment rates must be based on the sales information of the first company in the commercial chain that knew, at the time the merchandise was sold, that the merchandise was destined for the United States."

*Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 63 Fed. Reg. 55,361, 55,362 (Dep't of Commerce Oct. 15, 1998) (notice and request for comment on policy concerning assessment of antidumping duties) ("Reseller Notice").  Because the Department presumes that foreign producers are aware of the ultimate destination of their merchandise, resellers are required to post antidumping duty deposits at the same rates as the producers from whom they acquire the merchandise they export into the United States. *Reseller Notice*, 63 Fed. Reg. at 55,362.

Accordingly, if a reseller identifies a producer on the forms it submits to Customs and Border Protection ("Customs"), and the reseller has not been assigned a company-specific cash deposit rate,[8] the agency will require the payment of cash deposits for those entries at the rates of the identified producers.  These entries are then liquidated at the producer's cash deposit rate, unless an administrative review is requested for either the producer or reseller.  Reseller Notice, 63 Fed. Reg. at 55,362 ("The Department instructs Customs to apply any reseller's company-specific cash deposit rate to entries of merchandise sold by that reseller.  If there is no company-specific reseller cash deposit rate and the

---

[8]      A reseller, or a producer, may have its own company-specific cash deposit rate if one was determined for it in the initial investigation or an administrative review.  Both TUNA and Hylsa had company-specific rates determined during the Fifth Administrative Review.

importer identifies the producer, the Department instructs Customs

to apply the producer's cash deposit rate to the entry.  This logic

stems from the fact that, when subject merchandise enters the United

States through a reseller, the Department does not know who set the

price of the subject merchandise to the United States.  The

Department instructs Customs to apply the producer's cash deposit

rate where the producer of the merchandise is identified on the

assumption that the producer knew that the merchandise was destined

for the United States.  This assumption is more often true than not.

Subject merchandise sold through a reseller and imported where there

is no company-specific reseller rate or where the importer did not

identify the producer of the merchandise is subject to the all-others

cash deposit rate.").

     Importantly, under the reseller policy, the all-others rate[9]

only applies to a reseller when (1) either Commerce "determines in

an administrative review that the producer did not know[10] that the

_____

     [9]     The all-others rate is a default cash deposit rate that
applies when no company-specific deposit rate has been determined
for goods from a particular exporter in the initial investigation
or during any prior administrative review.  Entries will only be
liquidated at the all-others rate when cash deposits are made at the
all-others rate, and those entries are not subject to an
administrative review.  *See* 19 U.S.C. § 1504(a).

     [10]    If Commerce determines that a producer did not know that
merchandise sold to a reseller was destined for the United States
then the reseller's goods will not be liquidated at the producer's
rates under the reseller policy.

merchandise it sold to the reseller was destined for the United States" or no producer-specific or reseller-specific cash deposit rate has been determined; and (2) "there was no company-specific review of the reseller for that review period."  Reseller Notice, 63 Fed. Reg. at 55,362-63.  Here, Commerce assumed that Mueller was subject to the all-others rate prior to the POR because it had never been subject to a review under the Order.  This assumption, however, does not necessarily hold when the record evidence is examined under Commerce's reseller policy.

The only evidence on the record concerning the cash deposits made on Mueller's entries suggests that Mueller, as a reseller without its own cash deposit rate, paid cash deposits at the rates of its producers.  *See* Customs Data File.  That is, Commerce itself placed on the record information it solicited from Customs relating to eleven of Mueller's entries, all of which demonstrate that Southland paid cash deposits for these entries equal to either TUNA's or Hylsa's antidumping duty rate.

By making these deposits it appears clear that plaintiffs believed that these entries were subject to Mueller's producers' rates in accordance with the reseller policy.  Because this Sixth Review is the first review under the Order in nearly ten years, Mueller's entries have likely been liquidated at its producers' cash deposit rates of 2.92% and 10.38% for almost a decade.  Therefore,

Commerce's determination that Mueller was subject to the all-others deposit rate from the outset does not seem to be in accord with the only evidence on the record.

Except to decline to take it into account, however, Commerce does not discuss this evidence in the Final Results. *See* Issues & Dec. Mem. at 11 ("[B]ecause the Department has been unable to examine Mueller's claim that it sourced subject merchandise from TUNA and [Hylsa], it is inappropriate to assign separate assessment rates for those entries, as advocated by Mueller."). Commerce attempts to justify its failure to address the evidence of Mueller's cash deposit rates by finding that "what rate Mueller was or was not subject to at the beginning of this administrative review is moot, because the fact remains that Mueller refused to cooperate with the Department's requests for information and is now subject to AFA." Issues & Dec. Mem. at 11.

A respondent's failure to cooperate, however, does not relieve the Department of its responsibility to assign a rate sufficient, but no more than sufficient, to insure cooperation. *Timken*, 354 F.3d at 1345; *F.Lli de Cecco Di Filipo Fara S. Martino, S.p.A. v. United states*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("Obviously a higher adverse margin creates a stronger deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference

rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence."). Nor does it mean that Commerce can ignore evidence that it put on the record itself. *See Kaiyuan Group Corp. v. United States,* 28 CIT. 698, 724, 343 F. Supp. 2d 1289, 1314 (2004) ("Substantial evidence requires that the agency's determination be based on the whole record and the reviewing court must examine all evidence that fairly supports and detracts from the determination."); *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (The existence of substantial evidences is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'").

Evidence of the rate Mueller was subject to at the beginning of the review, therefore, was not rendered moot by Mueller's status as an uncooperative respondent. Further, this rate is important to the outcome of this case because, if Mueller was not subject to the all-others rate at the beginning of the POR the Department's established practice leads to the conclusion that 32.62% would be sufficiently high to encourage Mueller's future cooperation. As a result, Commerce's failure to examine this information provides the second reason for a remand.

CONCLUSION

The Department's practice of applying the highest previously determined overall rate to an uncooperative respondent as AFA is based on the presumption that such a rate is inherently adverse. This practice is longstanding, frequently used, and has been held, in most circumstances, to be lawful.  *See, e.g., Rhone Poulenc*, 899 F.2d at 1190; *NSK Ltd. v. United States*, 28 CIT 1535, 1561, 346 F. Supp. 2d 1312, 1335 (2004); *Shanghai Taoen Int'l Trading Co. v. United States*, 29 CIT 189, 199, 360 F. Supp. 2d 1339, 1348 (2005).  Thus, any decision to abandon the application of this rate in favor of the highest transaction specific rate for another respondent in a previous review must be fully explained and based on substantial evidence.  *See Cultivos Miramonte S.A. v. United States*, 21 CIT 1059, 1064 n.7, 980 F. Supp. 1268, 1274 n.7 (1997) ("A change is arbitrary if the factual findings underlying the reason for change are not supported by substantial evidence."); *see also SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]n agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.") (internal quotation and citation omitted).

The Final Results do not provide a reasonable explanation for departing from Commerce's established practice based on Mueller's knowledge that it was subject to the all-others rate and,

nonetheless, withdrew from the review.  Nor has the Department

supported with substantial evidence its conclusion that Mueller was,

in fact, subject to the all-others rate during the time leading up

to the POR.  Thus, the Final Results do not provide a lawful

explanation, supported by substantial evidence, for departing from

Commerce's established practice of assigning to an uncooperative

respondent the highest overall rate from any segment of the

proceeding as the AFA rate.


ORDER

Accordingly, for the reasons stated, it is hereby

ORDERED that, upon remand, Commerce issue a redetermination

that complies in all respects with this Opinion and Order, is based

on determinations that are supported by substantial record evidence,

and is in accordance with law; it is further

ORDERED that Commerce shall reconsider its determination not

to apply the all-others rate to Mueller's entries.  In doing so, the

Department shall consider whether Mueller knew, or could be charged

with knowing, that it was subject to the all-others rate of 32.62%

prior to the POR, and discuss the record evidence related to the cash

deposits made on Mueller's entries.  Commerce shall then determine

an antidumping duty rate for Mueller; it is further

ORDERED that the Department may reopen the record to solicit

Court No. 10-00163                                              Page 24

any information it reasonably deems necessary to make its

determination; it is further

ORDERED that the remand results shall be due on April 16, 2012;

comments to the remand results shall be due thirty (30) days following

filing of the remand results; and replies to such comments shall be

due fifteen (15) days following filing of the comments.


                                   /s/ Richard K. Eaton
                                  Richard K. Eaton

Dated: December 16, 2011
       New York, New York